UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE EMPIRE STAT GROUP, LLC,

          Debtor.

ANGELA TESE-MILNER, as Chapter 7 Trustee for Empire Stat Group, LLC,

          Plaintiff,

– *against* –

COALITION, INC., COALITION INSURANCE SOLUTIONS, INC., NORTH AMERICAN CAPACITY INSURANCE COMPANY, *and* PELEUS INSURANCE COMPANY,

          Defendants.

**OPINION & ORDER**

24-cv-04101 (ER)

RAMOS, D.J.:

      Empire Stat Group, LLC ("ESG") filed for Chapter 7 relief on October 29, 2021. Doc. 5 at 2. Angela Tese-Milner, was thereafter appointed Chapter 7 trustee for ESG's estate. *Id.* On April 22, 2024, Ms. Tese-Milner brought an adversary proceeding against Coalition, Inc., Coalition Insurance Solutions, Inc., North American Capacity Insurance Company, and Peleus Insurance Company (collectively, the "Insurers"), seeking a declaratory judgment regarding the scope of ESG's insurance coverage and damages for breach of contract. Doc. 1-1 at 2–3. On May 29, 2024, the Insurers moved to withdraw the reference of the adversary proceeding to bankruptcy court pursuant to 28 U.S.C. § 157(d). *See* Doc. 1-1. For the reasons set forth below, the Insurers' motion to withdraw the reference is GRANTED.

## I. BACKGROUND

### A. Factual Background

ESG operated a medical insurance consultant business. Doc. 5 at 4. It offered independent medical exam and peer-review of medical billing services to insurance providers involved in personal injury actions. *Id.* In 2019, ESG's revenue was over $23 million. *Id.* This declined during the pandemic. *Id.* Between January and September of 2020, ESG brought in only $11 million. *Id.* ESG's business soon began to improve. *Id.* In August 2020, ESG generated approximately $40,000 per day in revenue. *Id.* One customer—Government Employees Insurance Company ("GEICO")—accounted for more than 90% of this revenue. *Id.*

In 2020, ESG purchased an insurance policy issued by the Insurers. *Id.* at 1. The policy covered business interruption losses caused by cyber-attacks for the period of October 30, 2020, through October 30, 2021. *Id.*

On December 13, 2020, ESG suffered a cyber-attack that impacted its operations. *Id.* On February 2, 2021, ESG submitted an insurance claim for $700,164 in business interruption losses incurred between December 14, 2020, and January 25, 2021 ("Claim One"). *Id.* at 5. The Insurers agreed to provide coverage for Claim One. *Id.* at 2; Doc. 6 at 4.

On February 19, 2021, GEICO terminated its contract with ESG. Doc. 5 at 4. ESG alleges that GEICO's decision to terminate the contract was a direct result of the cyber-attack, and that the projected revenue associated with the cancelled contract should therefore be covered as a business interruption loss. *Id.* at 4–5. On March 2, 2021, ESG submitted an insurance claim for $2,310,594 in business interruption losses incurred after January 25 ("Claim Two"). *Id.* at 5. On March 18, 2021, the Insurers denied coverage for Claim Two. *Id.*; Doc. 1-1 at 2.

### B. Procedural History

On October 29, 2021, ESG filed a voluntary petition for liquidation pursuant to Chapter 7 of the United States Bankruptcy Code. Doc. 1-1 at 2. Angela Tese-Milner was appointed as the Chapter 7 trustee for ESG's estate. Doc. 5 at 2. In this capacity, she pursued coverage for Claim One and Claim Two from the Insurers. *Id.* On February 28, 2022 the bankruptcy court approved the parties' settlement agreement for Claim One. *Id.*

On April 22, 2024, Ms. Tese-Milner commenced an adversary proceeding against the Insurers seeking declaratory judgment regarding the scope of the insurance policy and damages for breach of contract stemming from the Insurers' denial of coverage for Claim Two. Doc. 1-1 at 2–3.

Less than three weeks later, the Insurers filed the instant motion to withdraw the bankruptcy reference pursuant to 28 U.S.C. § 157(d). *See* Doc. 1-1. Ms. Tese-Milner filed her opposition on June 12, 2024. *See* Doc. 5.

## II. LEGAL STANDARD

District courts have "original but not exclusive jurisdiction" over all bankruptcy proceedings. *See* 28 U.S.C. § 1334(b). In this District, bankruptcy proceedings are automatically referred to bankruptcy court pursuant to 28 U.S.C. § 157(a). *See Amended Standing Order of Reference Re: Title 11*, 12 Misc. 32 (S.D.N.Y. Feb. 1, 2012). After a proceeding is referred to bankruptcy court, a district court's authority to withdraw the reference is governed by 28 U.S.C. § 157(d): "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."

The statute does not define "cause," but the Second Circuit has outlined a framework by which district courts can assess whether cause for withdrawal exists. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993). First, a district court engages in a threshold inquiry to determine the bankruptcy court's authority to enter final judgment in the matter. *Id.* Second, using this information, a district court evaluates

3

whether considerations of judicial efficiency, uniformity of bankruptcy administration, the parties' jury trial rights, and the prevention of forum shopping favor withdrawal.  *Id.*

### A. Threshold Inquiry

By statute, bankruptcy proceedings are categorized as core or non-core.  *See* 28 U.S.C. § 157.  At the time *Orion* was decided, it was accepted that bankruptcy courts had statutory authority to enter final judgment in "core" claims.  *Id.* at (b)(1).  Thus, the threshold inquiry used in *Orion* was whether the claim at issue was core pursuant to the statute.  4 F.3d 1101.  This has since been modified by the holding in *Stern v. Marshall*, 564 U.S. 462 (2011).

In *Stern*, the Supreme Court clarified that the *statutory* designation of a claim as core did not necessarily confer on a bankruptcy court the *constitutional* authority to finally adjudicate it.  *See Stern*, 564 U.S. 482–87.  The Supreme Court found that a bankruptcy court has the constitutional authority to finally adjudicate a claim—irrespective of statutory designation—in only three instances:  where the right being adjudicated is public rather than private; where the defendant filed a proof of claim in the bankruptcy proceeding; or where the parties consented to have the bankruptcy court enter final judgment.  *Lehman Bros. Holdings Inc. v. Wellmont Health Sys.*, No. 14-cv-1083 (LGS), 2014 WL 3583089, at *3 (S.D.N.Y. July 18, 2014) (discussing *Stern*, 564 U.S. at 488–95).

The Second Circuit has not addressed how the threshold inquiry established in *Orion* should be applied in light of the Supreme Court's decision in *Stern*, but courts in this District have generally followed one of two approaches.  *Roman Catholic Diocese of Rockville Centre v. Arrowood Indemnity Co.*, No. 20-cv-11011 (VEC), 2021 WL 1978560, at *3 (S.D.N.Y. May 17, 2021).  Some courts have replaced the threshold core/non-core distinction established in *Orion* with the question of constitutional

4

authority identified in *Stern*.[1]  Other courts have maintained *Orion's* core/non-core distinction but added *Stern's* constitutional authority inquiry as an additional threshold step.[2]

This Court will follow the latter approach:  constitutional constraints on a bankruptcy court's ability to enter final judgment do not render the statutory core/non-core distinction irrelevant.  *Diocese of Rockville Centre*, 2021 WL 1978560, at *4.  Even when a bankruptcy court lacks authority to enter final judgement, its experience adjudicating bankruptcy proceedings may make it more efficient for a "core" claim to remain in bankruptcy court.  *Id.*

Thus, the threshold inquiry pursuant to *Orion* as modified by *Stern* is two-fold.  First, the Court must determine if the claim at issue is one the bankruptcy court has the authority to finally adjudicate pursuant to the Constitution.  *See Stern*, 564 U.S. 482–87.  Second, the Court must determine if the claim at issue is core pursuant to the statute.  *Orion*, 4 F.3d at 1101.

### B.  *Orion* Factors

After having completed the threshold inquiry described above, the Court must then determine "whether the remaining factors of judicial efficiency, uniformity, the parties' jury trial rights, and the prevention of forum shopping favor withdrawal."  *Id.*

---

[1] *See, e.g., In re Kossoff PLLC*, No. 23-cv-4132 (JPC), 2024 WL 1892432, at *3 (SDNY Apr. 29, 2024); *Lehman Bros. Holdings Inc. v. Standard Pac. Mortg., Inc.*, No. 19-cv-4080 (WHP), 2019 WL 7593628, at *1 (S.D.N.Y. Aug. 23, 2019); *Lehman Bros. Holdings, Inc. v. Hometrust Mortg. Co.*, No. 15-cv-304 (PAE), 2015 WL 891663, at *2 (S.D.N.Y. Feb. 25, 2015); *In re Connie's Trading Corp.*, No. 12-cv-376 (GWG), 2014 WL 1813751, at *7 (S.D.N.Y. May 8, 2014); *Sec. Inv. Prot. Corp. Bernard L. Madoff Inv. Secs. LLC*, 486 B.R. 579, 582 n. 1 (S.D.N.Y. 2013*); In re Arbco Cap. Mgmt., LLP*, 479 B.R. 254, 262 (S.D.N.Y. 2012); *In re Lyondell Chem. Co.*, 467 B.R. 712, 719 (S.D.N.Y. 2012).

[2] *See, e.g., Sec. Inv. Protection Corp. v Bernard L. Madoff Inv. Sec. LLC*, No. 20-cv-04767 (MKV), 2023 WL 6122905, at *2 (S.D.N.Y. Sept. 18, 2023); *Roman Catholic Diocese of Rockville Centre v. Arrowood Indemnity Co.*, No. 20-cv-11011 (VEC), 2021 WL 1978560, at *3 (S.D.N.Y. May 17, 2021); *Scott v. AIG Property Casualty Co.*, No. 17-cv-1052 (GHW), 2017 WL 1380607, at *2 (S.D.N.Y. Apr. 17, 2017); *Dynegy Danskammer, LLC v Peabody COALTRADE Intern. Ltd.*, 905 F Supp 2d 526, 530 (S.D.N.Y. Nov. 7, 2012); *Adelphia Recovery Trade v. FLP Grp., Inc.*, No. 11-cv-6847 (PAC), 2012 WL 264180, at *3 (S.D.N.Y. Jan. 30, 2012); *Madison Bentley Assocs. v. Bentley Manhattan Inc., LLC*, 474 B.R. 430, 435 (S.D.N.Y. 2012)

Ultimately, the withdrawal analysis "comes down to whether efficiency and uniformity would be better served by litigating in the district court." *In re Haynes*, No. 14-cv-1474 (VB), 2015 WL 862061, at *2 (S.D.N.Y. Mar. 2, 2015). District courts have broad discretion in deciding whether withdrawal of the reference is warranted. *Id.*

## III.   DISCUSSION

The *Orion* factors, as modified post-*Stern*, weigh in favor of withdrawing the reference to bankruptcy court.

### A.   Threshold Inquiry

*1.   Final Adjudicative Authority*

Pursuant to *Stern*, a bankruptcy court lacks constitutional authority to finally adjudicate a claim unless it involves adjudication of a public right, the defendant filed a proof of claim in the bankruptcy proceeding, or the parties consented to the bankruptcy court entering final judgment in the matter. *Lehman Bros. Holdings,* 2014 WL 3583089, at *3. None of these exceptions apply in this case.

The public right exception applies when the claim at issue derives from a federal regulatory scheme, or it is deemed essential to a limited regulatory objective within the agency's authority that the claim be resolved by expert government agency. *Stern*, 564 U.S. at 490. Here, Ms. Tese-Milner seeks a declaratory judgment to determine her rights pursuant to an insurance policy and asserts a breach of contract claim. Doc. 1-1 at 2–3.

A common law contract claim does not implicate a public right. *See Dynegy Danskammer, L.L.C., v. Peabody COALTRADE Int'l Ltd.*, 905 F. Supp. 2d 526, 531 (S.D.N.Y. 2012) (finding that a breach of contract claim was "clearly outside" the bounds of the public rights exception); *see also In re Arbco Capital Mgmt., LLP*, 479 B.R. 254, 266 (S.D.N.Y. 2012) (finding that state law claims, including breach of contract, "are indisputably private rights"). Ms. Tese-Milner's request for declaratory judgment "does not transform a contract dispute under New York law into a dispute concerning public

6

rights." *Diocese of Rockville Centre*, 2021 WL 1978560, at *4 n. 12. Thus, Ms. Tese-Milner's claims do not involve the adjudication of a public right.

As to the second exception, the Insurers have not filed a proof of claim in the underlying bankruptcy proceeding. Finally, the Insurers have not consented to the bankruptcy court entering final judgment in this matter. Doc. 1-1 at 10.

Because none of the exceptions outlined in *Stern* apply, the bankruptcy court does not have the constitutional authority to finally adjudicate Ms. Tese-Milner's complaint. Accordingly, were the claim to remain in bankruptcy court, the bankruptcy court would be limited to submitting proposed findings of fact and conclusions of law for *de novo* review by the district court. *See Orion*, 4 F.3d 1100–01.

Ms. Tese-Milner does not contest this. *See* Doc. 5 at 9–10. Rather, she notes that courts in this District "deny motions to withdraw the reference even where the bankruptcy court lacks constitutional authority to enter a final judgment where analysis of the *Orion* factors weighs in favor of denying a motion to withdraw the reference." *Id.* at 10. The Court does not disagree. However, the Court finds that the *Orion* factors weigh in favor of withdrawing the reference. *See Diocese of Rockville Centre*, 2021 WL 1978560, at *4.

2. *Core/Non-Core Distinction*

There is no statutory definition of the term "core," though § 157(b)(2) offers a non-exhaustive list of claims that would qualify as such. A claim is not core simply because it involves the estate's assets. *Orion*, 4 F.3d at 1102. Rather, a claim is core when it is "directly related to a bankruptcy court's central functions." *See Mt. McKinley Insurance Co. v. Corning Inc.*, 399 F.3d 436, 448 (2d Cir. 2005). For example, a claim that could only arise in the context of a bankruptcy case is core. *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999). A contract claim is sufficiently related to a bankruptcy court's central functions to constitute a core claim in two circumstances: when it arises

7

from contracts formed after the bankruptcy petition was filed; and when it directly affects a core bankruptcy function. *See id.*

Ms. Tese-Milner's claims are non-core. The contract at issue was entered into a year before the bankruptcy petition was filed. Doc. 5 at 1–2. Claims for pre-petition contract damages are usually non-core. *See Scott v. AIG Property Casualty Co.*, No. 17-cv-1052 (GHW), 2017 WL 1380607, at *3 (S.D.N.Y. April 17, 2017) (collecting cases). The claims do not turn on bankruptcy law; resolution requires the court to interpret a contract, not administer an estate. Further, the coverage dispute here concerns the amount of assets available, not their allocation. *See* Doc. 5 at 8–9. Any amount Ms. Tese-Milner does recover "would merely augment the amount of assets available for distribution generally to [ESG's] creditors, not affect the bankruptcy court's core functions of administering [ESG's] estate." Doc. 6 at 4. And "where the insurance proceeds would only augment the assets of the estate for general distribution, the effect on the administration of the estate [is] insufficient to render the claim core." *U.S. Lines*, 197 F.3d at 638 (citing *Orion*, 4 F.3d at 1102).

Ms. Tese-Milner disagrees. *See* Doc. 5 at 7–9. She urges—relying on *In re U.S. Lines, Inc.*, 197 F.3d 631 (2d Cir. 1999), and *In re County Seat Stores, Inc.*, No. 01-cv-2966 (JGK), 2002 WL 141875 (S.D.N.Y. Jan. 31, 2002)—that a contract claim is rendered core when the insurance policy at issue constitutes a significant portion of the estate and determinations about the coverage are therefore likely to substantially impact the recovery of creditors. *Id.*

*U.S. Lines* concerned an adversary proceeding in which the debtor-plaintiff sought a declaratory judgment to establish coverage under a pre-petition insurance policy for tort claims brought against the debtor. 197 F.3d, 634–635. The Second Circuit found the contract claim to be core by virtue of its impact on the reorganization proceedings. *Id.* 639. Three facts guided the court's analysis: First, the debtor was facing substantial

8

liability claims that fell within the coverage of the policy. *Id.* 638. Second, the policy was the debtor's only asset. *Id.* Third, the policy contained a pay-first provision. *Id.*

A pay-first provision conditions the insured's right to indemnity for losses covered by the insurance policy on a showing that the insured has made payment to the third-party claimant in the amount for which reimbursement is sought from the insurer. As the Second Circuit noted, pay-first provisions are particularly difficult to navigate when the insured is insolvent:

> Bankrupt debtors are limited in their ability to obtain new loans which otherwise could be used to create funds to satisfy the pay-first requirement, and promissory notes issued by an insolvent insured to a claimant are not considered payment that triggers an obligation to indemnify. The insolvent insured is therefore often forced to satisfy the pay-first requirement by means of complex, creative payment schemes.

*U.S. Lines,* 197 F3d 638. The difficulty posed by pay-first provisions is relevant because of the consequences failing to satisfy the provision carries: if the *U.S. Lines* debtor paid tort claimants with funds allocated to other creditors only to discover that the payments had failed to trigger the insurer's indemnification obligations, the outcome would be an inequitable distribution of assets among creditors. *Id.* In other words, the bankruptcy court could not easily proceed with the reorganization proceedings without first resolving the coverage dispute. *Id.* Because the contract claim "directly affect[ed] the bankruptcy court's core administrative function of asset allocation among creditors," it was core. *Id.* at 639.

*County Seat Stores* similarly concerned a coverage dispute regarding an insurance policy owned by the debtor which was the only source of potential payment for tort claimants. 2002 WL 141875, at *5. In deciding that the claim was core, the district court reasoned that "what was critical in *United States Lines* was not that the policy contained a pay-first provision but rather that the bankruptcy court could not easily proceed with its core function of effecting an equitable reorganization without deciding the coverage

dispute in the case." *Id.* Paying claimants before the coverage dispute was resolved could result in creditors receiving funds they were not entitled to, therefore causing an inequitable distribution of assets. *Id.*, at *6. Because the claim "threaten[ed] to affect a core bankruptcy in a direct manner," the district court found it to be core. *Id.*

*U.S. Lines* and *County Seat Stores* are distinguishable from the present case: the debtor in both was faced with tort claims within the coverage of the disputed policy. That is not the case here. Moreover, *County Seat Stores* was decided before the Second Circuit clarified that its holding in *U.S. Lines* was "based on the mutually re-enforcing effects" of the insurance proceeds being the only asset available to pay personal injury claimants and the policies' pay-first provisions. *Mt. McKinley Insurance*, 399 F.3d 448. Thus, the majority approach in this District has been to limit *U.S. Lines* to its facts: "[A] declaratory judgment action about the scope of insurance policies is only core when the insurance policies are the lone asset and provisions in the insurance policies necessarily implicate core bankruptcy functions to enable the proceeds of the policies to be accessed." *Diocese of Rockville Centre*, 2021 WL 1978560, at *6; *see In re Residential Cap., LLC*, No. 15-cv-2712 (JPO), 2015 WL 9302834, at *4 (S.D.N.Y. Dec. 21, 2015); *see also DeWitt Rehab. & Nursing Ctr., Inc. v. Columbia Casualty Co.*, 464 B.R. 587, 592 (S.D.N.Y. 2012)

In this case, there is no contractual provision complicating access to the insurance proceeds. Moreover, while the insurance policy may be the estate's largest asset, it does not appear to be the estate's *only* asset. The Insurers assert that the policy is "one of multiple known assets of [ESG's] estate." Doc. 6 at 1. In support of this, the Insurers have provided a "listing of Debtor's assets." *See* Doc. 6-1. This listing indicates ESG owns $71,811.86 in assets outside of the insurance policy.[3] *See Id.* at 6.

Ms. Tese-Milner argues:

---

[3] The summary provided on the last page of the document indicates that ESG owns: $16,307.86 in cash, $46,704 in deposits, and $8,800 in furniture.

10

> The claims asserted against [ESG's] estate significantly exceed the amount of the partial settlement proceeds recovered by [Ms. Tese-Milner] for the [Claim One loss], the estate's only available asset for distribution. Without a recovery on the [Claim Two loss] sought through the adversary proceeding, the Debtor's unsecured creditors will receive a de minimis distribution, if any.

Doc. 5 at 8. As a result, Ms. Tese-Milner concludes, the coverage dispute is "inextricably intertwined" with efforts to administer the estate. *Id.* As discussed above, however, the Insurers contest the representation of the insurance policy as ESG's "only available asset" and have provided evidence of other assets. Moreover, Ms. Tese-Milner does not claim that the coverage dispute threatens to affect the allocation of assets between creditors. Rather, she contends that the dispute impacts the amount of assets available for general distribution. She therefore has failed to address the Second Circuit's holding that augmentation of assets for general distribution does not implicate core bankruptcy functions. *See U.S. Lines*, 197 F.3d at 638. Accordingly, the Court finds Ms. Tese-Milner's argument unpersuasive.

### B. *Orion* Factors

#### 1. *Judicial Efficiency*

Because the bankruptcy court lacks constitutional authority to enter final judgment in these claims, were the Court to deny the Insurers motion, the bankruptcy court would be limited to submitting proposed findings of fact and conclusions of law for *de novo* review by a district court. In such cases, it is generally "inefficient to allow proceedings to go forward knowing that they will have to be substantially repeated." *Development Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 472 (S.D.N.Y. 2011); *see also DeWitt Rehab. & Nursing Ctr., Inc.*, 464 B.R. at 592 ("Such duplicate reviews of the contracts and facts are costly and time-consuming, and unnecessarily expend judicial resources."). However, "in cases where the bankruptcy court is more familiar with the record or already has extensive experience in the matter, it may be most efficient for the bankruptcy court to propose recommendations first, even

though the district court ultimately would have to review them *de novo*." *Dynegy Danskammer*, 905 F. Supp. 2d at 533.

Ms. Tese-Milner states that "the bankruptcy court has acquired a detailed understanding of the Debtor and its history as well as the Policy, through its prior approval for the settlement for [Claim One] and the currently pending Motion to Dismiss filed by [the Insurers]." Doc. 5 at 11. She argues—citing *In re Lyondell Chemical Co.*, 467 B.R. 712, 723 (S.D.N.Y. 2012), and *In re Extended Stay, Inc.*, 466 B.R. 188, 205 (S.D.N.Y. 2011)—that this is sufficient familiarity to warrant maintaining the adversary proceeding in bankruptcy court "rather than have the District Court independently duplicate work." *Id.*

The Insurers take the position that denying the motion to withdraw would be inefficient irrespective of the bankruptcy court's familiarity with the claim. Doc. 6 at 5. In non-core claims where bankruptcy courts are limited to submitting proposed findings of law and fact, parties are entitled to *de novo* review by a district court of any findings they object to. 28 U.S.C. § 175(c)(1). The Insurers argue that because such objections are highly likely to occur in this case, denying the motion to withdraw would result in the district court duplicating the efforts of the bankruptcy court. Doc. 6 at 7.

Neither *Lyondell Chemical* nor *Extended Stay* provide support for Ms. Tese-Milner's argument that judicial efficiency would be best served in this case by allowing the bankruptcy court to submit proposed findings for *de novo* review. In *Lyondell Chemical*, the district court denied the motion to withdraw the reference in order to allow the bankruptcy court to issue opinions on pending motions on which the bankruptcy court had already completed "quite a bit of work"— including hearing over eight hours of oral arguments—in the course of preparing to rule. 467 B.R. 712 at 715. The district court did not preclude the plaintiff from refiling the motion to withdraw once the motions were resolved. *Id.* There is no indication that the bankruptcy court in the present case has completed similar—or any—work on the pending motion to dismiss. *See* Doc. 5 at 11.

As a result, there is nothing for the district court to "independently duplicate." As to *Extended Stay*, the district court there denied the motion to withdraw the reference because it found that the bankruptcy court's proposed findings of fact and conclusions of law would "narrow the issues to be resolved by this Court." 466 B.R. 188 at 207. But such narrowing is not needed here, where the dispute is a clearly outlined issue of contract interpretation. Doc. 1-1 at 1.

The record here does not suggest that the bankruptcy court has specialized knowledge or familiarity with the claims at issue. Though the bankruptcy court has presided over the bankruptcy case since October of 2021, the adversary proceeding was only filed in April of 2024 at which point the Insurers immediately filed the instant motion to withdraw the reference. Doc. 1-1 at 2–3. Ms. Tese-Milner raises concerns about duplicative work, but points to no steps taken by the bankruptcy court regarding these recently filed claims indicative of substantive work. *See* Doc. 5 at 11–12. While the bankruptcy court had exposure to the insurance policy through its approval of the Claim One settlement in February of 2022, this is insufficient to establish that the bankruptcy court has a "detailed understanding" of the policy provisions now in dispute. The bankruptcy court also does not have any special expertise with the issues raised in the adversary proceeding: "Contract disputes are the bread and butter of district courts; bankruptcy courts do not have any specialized knowledge that will contribute to swifter resolution of the claims at issue." *Diocese of Rockville Centre*, 2021 WL 1978560, at *8 (internal citations and quotation marks omitted).

Because the claims at issue are recently filed contract claims that the bankruptcy court does not have any specialized familiarity of or experience with, withdrawing the reference will avoid the duplication of effort in resolving the case and is therefore a more efficient use of judicial resources. *See Scott*, 2017 WL 1380607, *4.

## 2. *Uniformity*

"This factor encompasses both the uniform administration of bankruptcy law and intra-case uniformity." *Diocese of Rockville Centre*, 2021 WL 1978560, at *10. As to the uniformity of bankruptcy law, this factor is neutral because the adversary proceeding concerns non-core claims that do not arise under bankruptcy law. *See Dynegy Danskammer*, 905 F. Supp. 2d at 533–34 ("Courts routinely have found no benefit [to the uniform administration of bankruptcy law] where claims are based on state law.").

As to the intra-case uniformity, this factor is also neutral. Ms. Tese-Milner argues that uniformity is served by having the bankruptcy court hear the case because "the adjudication of the adversary proceeding will have a significant impact on [ESG's] estate." Doc. 5 at 13. However, as already discussed, this is a non-core claim distinct from the underlying bankruptcy proceeding. Thus, having a district court decide this matter would not result in inconsistent rulings between the district court and bankruptcy court. *See Diocese of Rockville*, 2021 WL 1978560, at *10.

For these reasons, the Court does not believe that uniformity weighs against withdrawing the reference.

## 3. *The Parties' Jury Trial Rights*

The Insurers have demanded a jury trial on the causes of action triable by a jury. Doc. 1-1 at 9. Bankruptcy courts are prohibited from conducting jury trials on claims over which they lack final adjudicative authority. *Orion* 4 F.3d at 1101. "[A] district court might find that the inability of the bankruptcy court to hold the trial constitutes cause to withdraw the reference." *Id.* Ms. Tese-Milner argues that withdrawing the reference on this basis when the case is still in pre-trial posture would be premature. Doc. 5 at 14–16.

This case is still early in its early stages. *See* Doc. 1 at 1–3. "Like most other civil cases, this case is unlikely to be tried; it is more likely to settle or to be resolved on dispositive motions." *Diocese of Rockville Centre*, 2021 WL 1978560, at *10.

Accordingly, while the parties' jury trial rights weigh in favor of withdrawal, the Court does not attach much weight to this factor. *See id.*

    4. *Forum Shopping*

There is no indication that the Insurers were engaged in forum shopping "as opposed to a genuine desire for more efficient adjudication," *Dynegy Danskammer*, 905 F. Supp. 2d at 533, when they moved to withdraw the reference. Further, due to the bankruptcy court's limited adjudicative authority, these claims may end up before a district court irrespective of the outcome of this motion. Thus, consideration of forum shopping does not weigh against withdrawing the reference. *See Brown Publishing Co. v. Brown*, No. 15-cv-0531 (JS), 2017 WL 455418, at *5 (E.D.N.Y. Feb. 1, 2017) (holding that the inability of a bankruptcy court to enter a final judgment eliminates concerns over forum shopping).

## IV.  CONCLUSION

For these reasons stated above, the Insurers motion to withdraw the bankruptcy reference is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 1.


It is SO ORDERED.

Dated:   August 5, 2024
           New York, New York

                                                  EDGARDO RAMOS, U.S.D.J.